U.S. OIL, INC., d/b/a Express Convenience Center, Enge's Beer & Liquor, EZ Mart, Farrell's Red Owl, Lauer's Food, Inc., Lauer's Food Mart, Inc., Ma & Pa's Grocery Express, Merwin Fuel Mart, QSO, Inc., Stop n Shop Food of Fond Du Lac, Inc., and Warra Enterprises, Inc., Plaintiffs-Respondents,

v.

CITY OF FOND DU LAC, Defendant-Appellant.

Court of Appeals

*No. 95–0213. Oral argument November 22, 1995.—Decided January 10, 1996.*

(Also reported in 544 N.W.2d 589.)

On behalf of the defendant-appellant, there were briefs and oral argument by *James A. Flader*, assistant city attorney.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Thomas L. Shriner, Jr.* and *Michael B. Brennan* of *Foley & Lardner* of Milwaukee. There was oral argument by *Thomas L. Shriner, Jr.*

On behalf of the City of Fond du Lac, there was a brief filed by *Maria K. Myers* and *James M. Jorissen* of *Davis & Kuelthau, S.C.* of Milwaukee. There was oral argument by *James M. Jorissen.*

On behalf of the League of Wisconsin Municipalities, there was a brief filed by *Claire Silverman* of Madison.

On behalf of Petroleum Marketers Association of Wisconsin and Wisconsin Association of Convenience Stores, the cause was submitted on the brief of *Jon P. Axelrod* and *Stephen A. DiTullio* of *DeWitt Ross & Stevens S.C.* of Madison. There was oral argument by *Jon P. Axelrod.*

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J.   The City of Fond du Lac has enacted an ordinance aimed at curtailing the ability of area

teenagers to get tobacco products. In particular, the ordinance bans self-service displays that enable consumers to access single packs of cigarettes without merchant assistance. This effectively means that all single packs of cigarettes must pass through the retailer's hands before the customer gets possession. We hold, however, as did the trial court, that this ordinance is invalid because the state preempted the field of tobacco distribution when it promulgated §§ 48.983, 134.66, and 139.43, STATS. We affirm.

In December 1993, the City adopted an ordinance designed to limit teenage tobacco use. It acted in response to a study conducted by Western Michigan University which revealed an alarming rate of tobacco use in the area schools. The study reported that these children primarily obtained the product by either shoplifting or direct purchases. The City also observed results from a study of an Illinois community which showed how tobacco use among minors could be effectively limited through a regulatory program targeted at tobacco retailers.

Accordingly, the City adopted a regulatory scheme patterned on this successful ordinance. Our analysis reveals that the City's ordinance has four other facets in addition to the ban on self-service displays. FOND DU LAC, WIS., ORDINANCES § 12.30(2)(d). First, it adopts the state restrictions regarding tobacco sales. *Id.* at § 12.30(1). Thus, the City acquired the authority to directly enforce the state's basic regulatory scheme which includes licensing provisions, prohibitions on sales to minors (under eighteen years of age) and rules regarding placement and operation of vending machines. *See* §§ 48.983, 134.65 and 134.66, STATS. Second, the City adopted a specific provision requiring tobacco sellers to request identification from persons

337

who did not appear to be eighteen years old. *See* FOND DU LAC, WIS., ORDINANCES § 12.30(2)(a). Next, the City ordinance requires that all tobacco products be sold in their original packaging and include all health warnings. *Id.* at § 12.30(2)(b). Finally, the ordinance commits the City to making a minimum number of compliance inspections at area retailers. *Id.* at § 12.30(4).

In May 1994, U.S. Oil, Inc. filed an action seeking to have the ordinance declared void. The trial court issued an order to stay enforcement of the ordinance in June 1994 and scheduled oral arguments for the following October. There, U.S. Oil argued, in essence, that because the state legislature has enacted comprehensive regulations governing the sale and use of tobacco, the City had overstepped its police power when it enacted this ordinance. In response, the City challenged U.S. Oil's contention that the state statutes covering tobacco sales and usage were so comprehensive as to usurp local government's authority to act.

The trial court agreed with U.S. Oil and in January 1995 entered a judgment declaring the ordinance void as preempted by state law. The City appealed. We are thus faced with an issue of statutory interpretation: does the state legislation preempt the City's tobacco ordinance. This is a question of law that we review de novo. *See DeRosso Landfill Co. v. City of Oak Creek*, 191 Wis. 2d 46, 49-50, 528 N.W.2d 468, 469 (Ct. App.), *petition for review granted*, 534 N.W.2d 85 (1995).[1]

---

[1] Both parties moved the trial court for summary judgment on the issue of whether the ordinance was valid and frame the appeal to this court as a review of summary judgment. But whether the issue is cast as a pure question of statutory inter-

Wisconsin municipalities have both constitutional, WIS. CONST. ART. XI, § 3, and statutory home rule power. *See* § 62.11(5), STATS. The City, however, argues only that its statutorily derived powers support its ordinance.[2]

When addressing whether home rule power exists under § 62.11(5), STATS., the court must first ascertain whether the legislature has declared a subject area to be of "statewide concern." If it is, then the court must determine if the legislature, even though it has declared a statewide interest, has nonetheless permit-

pretation, or as a review of the trial court's award of summary judgment to U.S. Oil, we still review the matter de novo. *Compare DeRosso Landfill Co. v. City of Oak Creek*, 191 Wis. 2d 46, 49-50, 528 N.W.2d 468, 469 (Ct. App.) (describing de novo review of state-local preemption questions), *petition for review granted*, 534 N.W.2d 85 (1995), *with Preloznik v. City of Madison*, 113 Wis. 2d 112, 115-16, 334 N.W.2d 580, 582-83 (Ct. App. 1983) (describing de novo review of summary judgment methodology).

[2] In its briefs, the City summarized its appellate position as follows:

> Summary judgment should be granted in favor of the appellant because appellant is authorized by Section 3, Article XI of the Wisconsin Constitution and its enabling legislation, Wis. Stat. § 62.11(5), to adopt the ordinance and such authority is not preempted by state law.

However, the statutory home rule power under § 62.11(5), STATS., is separate and distinct from the constitutional home rule power; this statute is not an "enabling statute" of the constitution. *See State ex rel. Michalek v. LeGrand*, 77 Wis. 2d 520, 526-27, 253 N.W.2d 505, 506-07 (1977) (describing results of constitutional home rule amendment). After we inquired at oral argument, the City acknowledged that it was only asserting its statutory home rule authority.

339

ted local authorities to act, and to what extent they may act. The rationale supporting this analytic procedure was explained in *State ex rel. Michalek v. LeGrand*, 77 Wis. 2d 520, 253 N.W.2d 505 (1977), where the court wrote:

> In an area solely or paramountly of statewide concern, the legislature may either delegate to local units of government a limited authority or responsibility to further proper public interests, or may preempt the field by expressly banning local legislative action as to such matter of statewide concern.

*Id.* at 529, 253 N.W.2d at 508 (quoted source omitted). We will thus begin by determining whether the legislature has manifested the level of interest in tobacco distribution identified in *Michalek*.

Before the trial court, and here on appeal, U.S. Oil primarily bases its argument regarding the question of statewide concern on §§ 48.983, 134.66 and 139.43, STATS. The relevant portions of these statutes are reproduced at the margin.[3] The touchstone language

---

[3] The applicable statutes include:

**48.983 Purchase or possession of tobacco products prohibited. (1)** In this section:

(a)  "Cigarette" has the meaning given in s. 139.30(1).

. . . .

(c)  "Tobacco products" has the meaning given in s. 139.75 (12).

**(2)**  Except as provided in sub. (3), no child may do any of the following:

(a)  Buy or attempt to buy any cigarette or tobacco product.

(b)  Falsely represent his or her age for the purpose of receiving any cigarette or tobacco product.

(c)  Possess any cigarette or tobacco product.

**(3)**  A child may purchase or possess cigarettes or tobacco products for the sole purpose of resale in the course of employment during his or her working hours if employed by a retailer licensed under s. 134.65(1).

within the many sections of these statutes includes a requirement that localities may only adopt tobacco-related ordinances which "strictly conform" to state

. . . .

**(5)** A county, town, village or city may adopt an ordinance regulating the conduct regulated by this section only if it strictly conforms to this section.

**134.66 Restrictions on sale or gift of cigarettes or tobacco products. (1)** DEFINITIONS. In this section:

(a) "Cigarette" has the meaning given in s. 139.30(1).

. . . .

(j) "Tobacco products" has the meaning given in s. 139.75(12).

. . . .

**(2)** RESTRICTIONS. (a) No retailer, manufacturer or distributor may sell or give cigarettes or tobacco products to any person under the age of 18, except as provided in s. 48.983(3).

. . . .

**(3)** DEFENSE OF RETAILER, MANUFACTURER AND DISTRIBUTOR. Proof of all of the following facts by a retailer, manufacturer or distributor who sells cigarettes or tobacco products to a person under the age of 18 is a defense to any prosecution for a violation of sub. (2)(a):

(a) That the purchaser falsely represented that he or she had attained the age of 18 and presented an identification card.

(b) That the appearance of the purchaser was such that an ordinary and prudent person would believe that the purchaser had attained the age of 18.

(c) That the sale was made in good faith, in reasonable reliance on the identification card and appearance of the purchaser and in the belief that the purchaser had attained the age of 18.

**(4)** PENALTIES. (a) 1. In this paragraph, "violation" means a violation of sub. (2)(a) . . . or a local ordinance which strictly conforms to sub. (2)(a) . . . .

. . . .

3. A court shall suspend any license or permit issued under s. 134.65, 139.34 or 139.79 to a person for [a violation of these rules]

. . . .

. . . .

4. The court shall promptly mail notice of a suspension under subd. 3. to the department of revenue and to the clerk of each municipality which has issued a license or permit to the person.

. . . .

341

law. *See* §§ 48.983(5) and 134.66(5). Moreover, § 139.43 expressly states that "providing a uniform regulation of the sale of cigarettes" is of "statewide concern."

Pointing to the cited statutes, especially the terms "strictly conforms" and "statewide concern," U.S. Oil argues that the state legislature has "expressly declared this comprehensive system of laws to preempt supplemental local regulation."

As outlined above, we must first decide whether the legislature has expressed a "statewide concern" in the sale of tobacco products to minors as that term is defined in *Michalek*. At U.S. Oil's prompting, our focus initially turns to the language "statewide concern" found in the tax laws, § 139.43, STATS., and how it affects the state's restrictions on tobacco distribution.

The City argues that because the "statewide concern" language deals only with the *taxation* of cigarettes, and that indeed the whole of ch. 139, STATS., only concerns the taxation of beverages, controlled substances and cigarettes, U.S. Oil may not successfully argue that this statutory language was also meant to encompass the sale of tobacco to minors.

■

The legislative history of these laws reveals that the state's interest in regulating tobacco distribution came twenty years after its decision to tax tobacco products. *Compare* 1987 Wis. Act. 336, §§ 1 and 2 (creating §§ 48.983(5) and 134.66(5), STATS.) *with* Laws of 1965, ch. 67, § 4 (creating § 139.43, STATS.). We nonetheless determine that the terms manifesting the

---

**(5)** LOCAL ORDINANCE. A county, town, village or city may adopt an ordinance regulating the conduct regulated by this section only if it strictly conforms to this section.

**139.43 Statewide concern.** Sections 139.30 to 139.44 shall be construed as an enactment of state-wide concern for the purpose of providing a uniform regulation of the sale of cigarettes.

"statewide concern" in the "uniform regulation of the sale of cigarettes" also apply to all aspects of tobacco distribution.

Our conclusion is based on three observations. First, the state rules regarding tobacco distribution make many references to the legislation governing the taxation of these products. *See, e.g.*, § 48.983(1)(a), STATS. (incorporating definition of "cigarette" set out in ch. 139, STATS.). More significantly, the penalty scheme laid out in the tobacco *distribution* regulations requires the sentencing court to not only suspend the retailer's *taxation* permit, *see* § 134.66(4)(a)3, STATS., but to also inform the department of revenue of this suspension. *See* § 134.66(4)(a)4. Thus, when the legislature approached the task of designing laws to limit minors' access to tobacco, it relied upon the legislative conclusions concerning tobacco taxation that had been set out twenty years earlier. It made an active choice that its distribution regulations would be most effective if they incorporated existing law.

Finally, even if we did not face the "statewide concern" language within § 139.43, STATS., we recognize that the legislature's decision to enact distribution regulations, and to graft onto these laws the "strictly conforms" requirement, must be given independent weight in our analysis. The legislature could have, hypothetically, enacted a law enabling localities to pass their own minimum tobacco age. Such a statute would reveal to us some legislative interest in having a minimum age, but the functions of such a law would suggest that the state did not consider a specific minimum age requirement to be of statewide concern.

But we do not face this hypothetical. In fact, the legislature set out eighteen years of age as a bright-line standard, *see* § 48.983(2), STATS., and further required

that all localities meet this standard. *See* § 48.983(5). The legislature has expressed its desire to become the primary authority on this issue. In sum, we reject the City's contention that the state's tobacco regulations do not reveal the legislature's intent to be the leader in the field of tobacco sales to minors.

Furthermore, we likewise reject the City's contention that the statutes cited above are "merely regulating modest aspects of tobacco sales" and "can hardly be construed as a comprehensive regulatory scheme." Here, the City contends that we should look for more than simple legislative expressions when measuring if there is statewide concern in a subject matter. Instead, it submits that we should look to the degree of state involvement. The proposed analysis would seemingly require us to look for more concrete signals, such as express delegation of rulemaking and enforcement authority to an administrative agency. *See, e.g., Wisconsin's Envtl. Decade, Inc. v. DNR*, 85 Wis. 2d 518, 527, 271 N.W.2d 69, 73 (1978) (noting that the legislature had specifically appointed the DNR to manage the state's water resources).

While the degree of state legislative activity, the method of enforcement and the amount of state resources allocated towards a given subject matter may aid a court in determining whether there is a statewide concern, the caselaw also reveals that the judiciary should accept simple legislative assertions that a matter is of statewide concern. *See Wisconsin Ass'n of Food Dealers v. City of Madison*, 97 Wis. 2d 426, 431, 293 N.W.2d 540, 543 (1980) ("[L]egislative determinations that matters are of statewide concern are entitled to great weight."). In regard to tobacco distribution, we face this kind of express legislative declaration. *See* § 139.43, STATS. Moreover, the City's proposed stan-

dard is impractical because it would implicitly restrain state legislative power. Some fields may be of statewide interest, yet not need extensive codes and administrative supervision to be effectively regulated. We cannot hold to a standard which would require the legislature to set up a dysfunctional administrative board every time it concludes that the state should be the primary, and perhaps solitary, voice of enforcement.

Having concluded that the distribution of tobacco is of statewide concern, we now turn to the second phase of the analysis. As explained above, the legislature's decision that a matter is of statewide concern does not itself preempt local rule-making power. The state may believe that the most effective way to combat a problem is to delegate some or all enforcement authority to local government. *See Michalek*, 77 Wis. 2d at 529, 253 N.W.2d at 508. This second step basically requires the reviewing court to discern the legislative intent. Four factors are used to guide the analysis:

> (1)   whether the legislature has expressly withdrawn the power of municipalities to act;
>
> (2)   whether the ordinance logically conflicts with the state legislation;
>
> (3)   whether the ordinance defeats the purpose of the state legislation; or
>
> (4)   whether the ordinance goes against the spirit of the state legislation.

*Anchor Sav. & Loan Ass'n v. EOC*, 120 Wis. 2d 391, 397, 355 N.W.2d 234, 238 (1984).

U.S. Oil raises two arguments that seem to address the first and last of these guideposts.[4] It places great emphasis on the legislature's choice of the term "strictly conforms" within §§ 48.983 and 134.66, STATS. U.S. Oil asserts that "[t]he meaning of 'strict conformity' is well settled under pertinent decisional law: As explicated by the Wisconsin Supreme Court, the term prohibits localities from adopting ordinances that are more restrictive than state law." *See City of Janesville v. Walker*, 50 Wis. 2d 35, 38-39, 183 N.W.2d 158, 160 (1971) ("[A]ny exercise of the police power in the field [of traffic regulations] must find its source in sec. 349.06 and comply with the strict conformity test."). U.S. Oil essentially asks us to assign special significance to the "strictly conforms" language set out in the state statutes.

On the other hand, the City contends that we cannot place this much weight on that term. It asserts that

[4] While the briefs of the parties and amici all point to the four factors set out in *Anchor Sav. & Loan Ass'n v. EOC*, 120 Wis. 2d 391, 397, 355 N.W.2d 234, 238 (1984), as the applicable "test" that we should apply, no party has provided a thorough explanation of *how* this test is applied. Does failure under one prong indicate that there is no local authority? Or, are all the factors reviewed in their totality? We also observe that at least one decision of this court has challenged whether a four-factor test is always appropriate. *See DeRosso Landfill Co.*, 191 Wis. 2d at 65, 528 N.W.2d at 476 ("Although phrased separately, parts two, three, and four of the four-part *Anchor Savings* test are essentially the same . . . ."). Nonetheless, we place significance on the supreme court's use of the disjunctive, i.e., the word "or," when it originally laid out the factors, *see Anchor Sav.*, 120 Wis. 2d at 397, 355 N.W.2d at 238, and thus conclude that these four elements serve as guideposts to the analysis. Thus, failure under one prong may or may not reveal that the state has withdrawn localities' ability to take action.

the legislature's use of the language "does not mean that a local municipality may not regulate conduct on which state law remains silent." In support it cites *City of Janesville v. Garthwaite,* 83 Wis. 2d 866, 266 N.W.2d 418 (1978). There, the local ordinance prohibited excessive automobile noise caused by squealing tires, loud engines or rattling mufflers. *Id.* at 867, 266 N.W.2d at 419. In an argument somewhat similar to U.S. Oil's, Garthwaite challenged the ordinance claiming that "strict conformity" language within the state's motor vehicle code served as a bar to local rulemaking. *See* § 349.06(1)(a), STATS. Even though the state had no rules aimed at his specific conduct (Garthwaite was cited for squealing his tires), he argued that the city of Janesville was nonetheless preempted from enacting its own law because the state had generally entered the traffic regulation business. *See Garthwaite,* 83 Wis. 2d at 867-71, 266 N.W.2d at 420-21.

The court held that the city of Janesville's ordinance was valid. It explained:

> Though the motor vehicle code regulates horn and muffler noise, we cannot conclude that such limited state regulation of excessive noise has preempted local control of all other motor vehicle noise.

*Id.* at 874, 266 N.W.2d at 423. The City contends that the underlying rationale of this holding supports its position.

More specifically, the City claims that its ordinance is valid because it too regulates aspects of tobacco distribution on which the state regulations are silent. In particular, the City focuses on how state law does not address the use of self-service displays. So just as the city of Janesville could issue a local ordinance to protect against automobile noise pollution because the

state code did not address this problem, the City of Fond du Lac should be allowed to regulate self-service displays because the state tobacco laws do not regulate these sales tools.

U.S. Oil responds, however, by pointing to the language differences in the motor vehicle laws and the statutes governing tobacco distribution. It notes that localities' power over traffic laws is not only governed by the term "strict conformity" within § 349.06(1)(a), STATS., but is also affected by the "not contrary to or inconsistent with" language of § 349.03(1)(a), STATS. It further illustrates that the *Garthwaite* court emphasized this distinction. *See Garthwaite*, 83 Wis. 2d at 875, 266 N.W.2d at 423 ("[S]ome amount of disuniformity is expressly provided for by sec. 349.03(1)(a) & (b) . . . ."). Therefore, U.S. Oil submits that if the *Garthwaite* court had faced a state law with only a "strict conformity" clause, it would have overturned the local ordinance.

While we decline U.S. Oil's invitation to assign talismanic significance to the "strict conformity" language and adopt a per se rule that this term always preempts local rulemaking power, we do partially agree with its interpretation of the *Garthwaite* decision. It does reveal that the "strict conformity" language may be evidence that the legislature has totally restricted local power to act. But the true legislative intent must be found in the language and structure of the statutes as a whole. Indeed, the first *Anchor Savings* guidepost requires only a determination of whether the state has "expressly withdrawn" the locality's power to act. *See Anchor Sav.*, 120 Wis. 2d at 397, 355 N.W.2d at 238. We believe that this could be accomplished through an endless variety of statutory language.

348

■ After searching the relevant statutes, we conclude that the "strictly conforms" language within the tobacco regulations must be read as withdrawing municipalities' ability to act outside of state mandates. Contrary to the City's position, we believe that the state rules are comprehensive.

Hence, what the City claims is intended silence in regards to a particular aspect of tobacco regulation is better described as differences in the *depth* of coverage that the legislature decided to assign to each aspect of a potential tobacco sale. While it is true that vending sales are closely regulated, *see, e.g.*, § 134.66(2)(c), STATS., and there is nothing discussing self-service displays, we must nonetheless look at the entire regulatory scheme. And when we do, we see evidence that the legislature considered everything when it entered the arena of tobacco distribution. The statutes range in coverage from taxation of this product, *see* ch. 139, STATS., to limitations on who may possess this product during the course of distribution. *See* § 48.983(3), STATS. The state has even gone so far as establishing affirmative defenses to the penalty provisions of the statutes. *See* § 134.66(3), STATS.

Indeed, the very fact that the legislature promulgated a law allowing a minor to purchase or possess tobacco in the course of employment indicates that the legislature contemplated the merits of the face-to-face sales which the city ordinance is designed to encourage. In addition, the very fact that the legislature decided to grant merchants an affirmative defense to illegal minor sales when the purchasing minor looked of age, showed an I.D., and falsely represented his or her age, *see* § 134.66(3), STATS., also shows that the legislature was aware that these face-to-face trans-

actions were taking place. Although, unlike the City, the legislature did not take the further step of encouraging more reliance on face-to-face transactions by placing a ban on self-service displays, its failure to act does not mean that it wanted localities to fill this void. The overall depth of legislative coverage in the field of tobacco sales informs us that the "strict conformity" language was intended to stop local rulemaking wherever the state law was silent, not enable it.

The parties have also raised arguments focusing on the last part of the *Anchor Savings* test. Here, U.S. Oil and the Petroleum Marketers Association as amicus, assert that the "spirit" of the state legislation is to prevent a "hodgepodge" of local restrictions. *See Anchor Sav.*, 120 Wis. 2d at 397, 355 N.W.2d at 238. This diversity would result in extra costs to retailers who would have to keep abreast of the dynamics of state and local law, and the differences between the laws of all the municipalities where they do business.[5]

---

[5] The Amicus Petroleum Marketers Association describes itself as representing approximately 1500 convenience store operators located throughout Wisconsin. Nonetheless, we are not sure that diversity in local regulations would have an equally negative effect on all these businesses. U.S. Oil, for example, submitted evidence that it would be costly and impractical for retailers who operate in *different locations* to familiarize themselves with the various local rules. We agree that such costs would affect profitability at these multi-municipality operators. On the other hand, truly local convenience stores may indeed be economically benefitted from restrictive local rules. The "hodgepodge" of local rules most harms those operators who need to learn several sets of laws. These extra costs of doing business, however, would also discourage these larger operators from entering new markets and thus create somewhat of a monopoly effect for the small retailer with stores in only one jurisdiction. *See generally* RICHARD A. POSNER, ECO-

They also appear to suggest that the legislature has struck a fair balance between the retailers' and the consumers' interest in low tobacco prices and the public interest in preventing minors from obtaining the product. In support of this argument, they submitted affidavits which showed how the City's ban on self-service displays could alone cause a retailer to lose $700 in monthly royalties.

The City, however, reads the policy of the state code as being targeted only towards preventing minors from getting tobacco. It cites the studies conducted at area schools which indicated how teenage tobacco use was a real threat to the community. More importantly, it presents evidence of how comparable ordinances and enforcement programs in other jurisdictions have successfully limited the problem and resulted in a decrease in teenage tobacco use and experimentation. The City and its amici contend that the ordinance is consistent with the spirit of state law; both are aimed at limiting teenage use of the product and both achieve this goal by regulating the distributors.

Within the state statutes one can see a legislative desire to prevent teenage smoking. In fact, a specific section of the Children's Code is geared towards the problem. *See* § 48.983, STATS. Moreover, the evidence submitted by the City strongly suggests that its enforcement program would be a great step forward in this goal.

Alas, however, we see a contradictory and more overwhelming goal in the state law. The express language of the relevant sections discussed above, and the implicit intent that we garner from the regulations overall, inform us that the principal goal of this legisla-

NOMIC ANALYSIS OF LAW § 19.3 (4th ed. 1992) (describing the economic theory of legislation).

tion is to insure statewide uniformity. Although the legislature's adherence to this policy may be an unwise course considering how it restricts localities, such as Fond du Lac, from taking affirmative steps towards ending illegal teenage tobacco use, the resolution of this problem will have to arise from the political process.[6]

*By the Court.*—Judgment affirmed.

---

[6] Such efforts are already underway. The Assembly Committee on Urban and Local Affairs has already held hearings on A.B. 516 which would amend §§ 48.983(5), 134.66(4)(a)1 and 134.66(5), STATS. As the Legislative Reference Bureau reports, this bill would permit localities to regulate aspects of tobacco distribution provided the regulations are "at least as strict" as the state rules. *See* 1995 A.B. 516.